STATE, EX REL. BAKER ET, PLAINTIFF, *v.* STEVENSON ET,
DEFENDANTS.

Common Pleas Court, Butler County.

No. 80662.   Decided December 3, 1962.

*Mr. Norman Grevey* and *Mr. George Jonson*, for plaintiff.
*Mr. Hjalmar Persson*, for defendants.

CRAMER, J. Relator, a student in the senior class at Taft High School, Hamilton, Ohio, brings this action in mandamus to compel the respondents herein—Board of Education and Superintendent of Schools of the City of Hamilton, Ohio—to allow him, though married, to engage in extra-curricular activities at the Taft High School.

Said relator, now seventeen years of age, became married at the age of sixteen in February, 1962. His wife, now age 17, also a student at Taft High School was pregnant at the time of her marriage and aged 16 years.

Since her husband was at the time of their marriage but 16 years of age, the consent of the Juvenile Judge of this county to the marriage being required by law, was obtained. The relator herein, as a sophomore and junior was extremely active in a number of extra-curricular activities, athletic and non-athletic alike. He was co-captain and an outstanding member of Taft High School basketball team last school year which won the State championship. He is an above average student popular and well liked by his fellow students and teachers and has never been a disciplinary problem.

In May, 1962, the Respondent Board of Education of the City of Hamilton adopted what it termed a "Code of Ethics," governing the pupils of the schools under its supervision and control. This Code, also came as a product of the recommendations of a committee composed of a number of people in the community. They represented and are identified with various groups and agencies and included school teachers, principals and school administrators.

The organization of this committee came as a result of what was considered to be a "moral problem existing in the community"—particularly as it appeared in the high schools

of the City of Hamilton. Various groups, parents, leaders of youth activities and organizations, P. T. A.'s, civic and other organizations through their representatives, brought this matter to the Board's attention and requested the adoption of rules and regulations—a code of ethics—governing the conduct of pupils of and in the schools.

In addition, a number of individuals—teachers, student counsellors, principals, school administrators, representatives of and leaders in other organizations and even several high school students, appeared before the Board. They expressed opinions concerning and made suggestions as to what should be included in such "Code."

The rule and regulation included within this "Code" with which we are here concerned is as follows:

"That married students in the Hamilton schools will not be permitted to participate in extra-curricular activities, effective as of the opening of the 1962-63 school year."

Extra-curricular activities are listed as including but not limited to the following:

(1) Leadership in school organizations or activities;
(2) Athletic activities;
(3) Scholarship activities;
(4) Member of band and glee club;
(5) Social events;
(6) Dramatic events and musical activities;
(7) Cheerleader;
(8) School sponsored trips.

The foregoing rule was adopted by the respondents herein by virtue of Section 3313.20, Revised Code of Ohio, which provides among other things as follows:

"The board of education shall make such rules and regulations as are necessary for its government and the government of its employees and the pupils of the schools. . . ."

This particular rule is being attacked as arbitrary, unreasonable, and discriminatory as applied to relator; also as violative of public policy in that it penalizes marriage and, therefore, is void. The relator, therefore, claims he is entitled to the allowance of the writ of mandamus as prayed for.

The action of a board of education, may in a proper case,

of course, be controlled by mandamus. Since boards of education have only such authority as is conferred by law, when they take action outside of and against the plain provisions of the law, such action is absolutely void. See Vol. 48 Ohio Jurisprudence (2d), Section 82, Page 490.

However, the grant of discretionary power given by the legislature to a board of education, such as is given by Section 3313.20, Revised Code, cannot be circumscribed by courts where the exercise of such power is reasonable and not clearly shown to be an abuse of discretion or in violation of the State and Federal Constitutions. The Court cannot coerce a Board into doing something in a different manner from that which, in the exercise of its lawful judgment and discretion it has acted, unless there has been an abuse of discretion.

Boards of education, rather than courts, are charged with the important and difficult duty of operating the public schools. So, it is not a question of whether this or that individual judge or court considers a given rule adopted by a board as expedient. The court's duty, regardless of its personal views, is to uphold the Board's regulation unless it is generally viewed as being arbitrary and unreasonable. Any other policy would result in confusion detrimental to the progress and efficiency of our public school system.

It is not sufficient, in order to impeach the acts of a Board of Education to show that it fell into error or failed to take that which a court thinks would have been a wiser course of action. We have no right to substitute our own discretion for that of the respondent.

This then brings us to the inquiry as to whether the Respondent Board of Education herein, in adopting this rule, abused its discretion. In other words, is this rule arbitrary, unreasonable and violative of public policy?

Our research has disclosed no case, nor have we been cited to any wherein this or a similar rule of the Board of Education came under the scrutiny of any Ohio court.

We have, however, the benefit of the conclusions of the courts and the reasons in support thereof—as disclosed by their opinions—(including the dissent) in the cases of:

*Cochrane* v. *Board of Education*, 360 Mich., 390; 103 N. W.

550

(2d), 569; *Kissick* v. *Garland School District*, 330 S. W. (2d), 708.

Much of what the Court said in the *Kissick case, supra,* is not only applicable but persuasive here.

We approach a consideration of the reasonableness and propriety of the rule under attack without any desire nor will we act as a super board of education and we have no right to substitute our judgment for that of the Board's. Our task is limited to a determination of whether, under the circumstances disclosed by the evidence, the action of the Respondent Board was unreasonable, arbitrary and constituted an abuse of discretion.

The presumption is always in favor of the reasonableness and propriety of any such rule duly adopted.

The burden, of course, is on the relator to prove, before he is entitled to the relief sought, that the complained of rule is unreasonable, arbitrary or violative of public policy.

Has such burden been discharged by him?

It clearly appears from the evidence that the Board, in adopting this particular rule, was motivated primarily by the desire to discourage juvenile marriages because such marriages result in student "drop outs."

The record here shows the following respecting the number of marriages in the two senior high schools in the City of Hamilton together with a number of married students who dropped out of school for the school years 1959-1960; 1960-1961; 1961-1962 and 1962-1963 (to date):

1959-60, number of marriages, 42; drop outs, 41;
1960-61, number of marriages, 53; drop outs, 50;
1961-62, number of marriages, 53; drop outs, 51;
1962-63, number of marriages, 52; drop outs, 41.

The number of students presently in both these senior high schools is approximately 2370.

It is thus seen that the number of married students who drop out of school is exceedingly high.

The Respondent Board, before adopting the rule here in question, was duly apprised, of course, of this situation. It was the Board's position—amply supported by the opinions expressed by those skilled in such matters who appeared before it, such as teachers, school principals, administrators and stu-

dent and youth counselors, that those who dropped out of school seriously handicapped their future.

It took due notice of the fact that in our society today the boy or girl who is not a senior high school graduate suffers great disadvantages; that many will find that the only employment open to them is the "dead end job"; and they will be seriously limited in not only earning a livelihood but in making effective use of their full capacities; and are precluded from ever receiving a college education which today employers are insisting upon more and more.

The Respondent Board conceived it to be its duty to the pupils under its supervision and control to encourage them in every conceivable way, in the best interests of the students and our nation, to receive all that which a completed senior high school education admittedly furnishes them.

The members of the Board, in addition to their own information and knowledge of the subject, had the advantage of the opinions duly expressed to them by trained, experienced educators, school principals, administrators and student and youth counselors and advisors, respecting the attitude of the student body as a whole toward the boy or girl who prominently engages and excels in extra-curricular activities—particularly, the "star" athlete.

It was, therefore, disclosed by the evidence—as a matter of fact, the Court could take judicial notice thereof—that those pupils so engaging and excelling in extra-curricular activities, notably the outstanding athlete (particularly in this county at this time the "star" basketball player), is given the "hero status" by his or her fellow students.

It is a matter of common knowledge that the student who excels in athletics sets a pattern of conduct which his associates in the school are proud to follow. The "hero," in the eyes of his followers, "can do no wrong."

Our own observations and what we learn from the newspapers, student publications, books, magazines, movies, television and radio, convince us as to the truth of the foregoing. We have all witnessed the effect upon the entire student body caused when the "star" football or basketball player decides to adopt a manner of speech, type of haircut, wear a particular kind of clothing, eat a particular kind of food, expresses a

preference for a definite song, singer, playing record, actor or performer and ad infinitum.

It is also a matter of common knowledge that a great segment of our adult population has likewise succumbed to the worship of the athlete. Many times the high school students have difficulty, in securing seats at athletic contests because the adults have pre-empted their places.

Untold thousands upon thousands of dollars have been reaped by manufacturers from the sale of razor blades, lotions, hair tonic and creams, cigarettes and many, many other items made popular merely because used and consumed by Mickey Mantle, Frankie Robinson (we have yet to hear from Jerry Lucas), Oscar Robertson, Sam Sneed, et al.

How much more susceptible, therefore, the high school student to the athletic "star."

Students today are, of course, more ready to accept the actions of their peers as the thing to do. If any married students are in a position of idolization, the more desirous is the group to mimic.

It is likewise apparent that the Board felt and took into consideration that married students need all the extra time available to provide a proper family life, and time spent in extra-curricular activities many times, is not conducive to this end.

Here, the evidence shows that relator, now that he is married and a father and expected to provide support for his wife and child, is employed after school hours earning Twenty Dollars per week. Would not the required and regular basketball practice which takes place after school seriously interfere with his employment? Would not attendance at extra-curricular club meetings and affairs create a problem affecting his and his wife's family and home life?

While the school authorities discourage marriage by the high school student, once it occurs and the married student remains in school, the Board ought to be permitted to restrict the extra-curricular activities of such a student so as to prevent the marriage from being subjected to burdens additional to that of the youthfulness of the husband or wife. Should not the Board, in respect to such marriages, adopt such rules which, in its judgment, would be best designed and conducive to the

preservation of the marriage? Can it be said that if a Board of Education, in the adoption of such rules, has such an objective in mind, it abuses its discretion? We think not.

In our opinion, it cannot be successfully claimed that the Respondent Board was unreasonable or arbitrary or abused its discretion, in concluding as it has, that marriage by the high school student causes the student to quit or drop out of school; nor in concluding that the married student engaging in extra-curricular activities sets a pattern which his or her fellow students follow; nor in concluding that participation by such a student in extra-curricular activities might interfere with and seriously affect that student's responsibilities as a husband and father; nor in concluding that the marriage has a better chance of lasting where interests of the husband or wife outside of and not connected with the home or marriage as such, are kept to a minimum.

In determining whether or not the Respondent Board abused its discretion in adopting the rule in question we have, of course, considered the opinions expressed in the trial of this cause by educators and people expert in the field of school administration. We are accustomed to accept the testimony of experts in the various fields of human activity as to what is or is not reasonably necessary as to the particular activity to which the expert is testifying. No reason is suggested as to why this practice should not be followed when the witness is an expert in the field of operating public high schools. Certainly, the principals of the high schools in question and the director of guidance at one of such schools should be regarded, by reason of their training, experience and observation as possessing particular knowledge as to the problem to which they have testified as being created by the marriage of students in their respective schools.

It is the Court's duty, regardless of its personal views, to uphold the Board's regulation unless it is viewed as being arbitrary and unreasonable. Any other policy would result in confusion detrimental to the progress and efficiency of our school system. No school could be operated and no citizen could be expected to serve on a school board if he or she were to be "second guessed" by the courts without regard to the local circumstances.

The Respondent Board took into consideration all the local circumstances and went to great length to determine what it should do to prevent and discourage child marriages and to prevent the lowering of the morale of the schools; it took care to preserve the right of this relator and other married students to obtain a high school education; it gave serious consideration to the means to employ to stop early marriages which caused students to leave school before they had completed their high school education; all of which, in our opinion, makes it clear that the Board acted reasonably and within the powers conferred upon it by the legislature.

It remains for us now to determine whether the adoption of the rule here in question is violative of public policy in that it penalizes persons because of marriage.

It is indeed the policy of the law to look with favor upon marriage and to seek in all lawful ways to uphold this most vital social institution; every intendment being in favor of matrimony.

This policy, however, is referable to those of lawful age who enter into the marriage relationship (male, 18; female, 16; Section 3101.01, Revised Code). On the other hand, the legislative policy is otherwise in so far as an underage marriage is concerned. Marriages entered into by a male under the age of eighteen is prohibited by statute except in the instance which here took place. Under such circumstances, the consent of the juvenile judge must first be obtained (Section 3101.04, Revised Code).

It thus appears that in this state it is clear that the public policy is not favorable to and in discouragement of "underage applicants" for matrimony.

The experience we gained, sitting as a trial judge in the divorce court in this county over a span of approximately eighteen years, reveals, at least to us, all too clearly the need to discourage those of immature years from entering into the marriage relationship. The life expectancy of such marriages is short indeed—the mortality rate thereof alarmingly high.

Any policy which is directed toward making juvenile marriages unpopular and to be avoided should have the general public's whole-hearted approval and support. The school au-

thorities, under whose supervision and control come the high school students, cannot be charged with abusing their discretion in promulgating rules which tend to make such marriages unpopular.

Is the rule void because it is retroactive in its effect on relator, since he was married prior to its adoption?

The evidence discloses that relator, by reason of his high proficiency as a basketball player, has a college athletic scholarship potential. It is suggested that such potential is in danger unless he would be permitted to play basketball this, his last year in high school. It doesn't necessarily follows that his abstention from play during his senior year would diminish his athletic scholarship prospects. He might be injured during play this year; his responsibilities as a father and concern therefor might adversely affect his performance on the court; other things might occur in connection with his playing basketball which could easily affect, even destroy, his future as a college player, thus preventing his receipt of an athletic scholarship.

However, assuming that there would be such diminution of his prospects, this rule cannot be said to be retroactive and, therefore, in violation of law, because its application takes no vested right away from relator.

That which he contends for amounts to no more than a contingent or expectant right in contrast to a vested right which is an immediate, fixed right of present future enjoyment. See *Kissick case, supra.*

It is, therefore, our opinion that this rule is not violative of the Constitution, State or Federal, because retroactive in its effect on relator.

Our attention has been called to an opinion of the Attorney General of Ohio on this subject being Opinion No. 2998, rendered May 15, 1962. It was his opinion that a board of education may not lawfully adopt a regulation prohibiting married students from participation in extra-curricular activities promoted by the school as a part of the regular school program. He made the observation that extra-curricular activities "have become an integral part of contemporary education."

Even though the Attorney General states that "to deprive a student from participating in such activities (extra-curricular)

for the dubious purpose of punishing marriage would amount to an abuse of discretion," it is apparent that he viewed the regulation under consideration as unwise and condemned it for that reason.

He thereby invaded a field of inquiry (the wisdom or unwisdom of the legislative act) denied, by law, both to him and this Court.

He apparently also found that the regulation was designed to "punish marriages." Such a motive is entirely absent here.

It is inconceivable to us, as it apparently was to the school experts who testified here,—and certainly a School Board does not abuse its discretion in not concluding—that, an athletic activity restricted to and participated in by but a mere "handful" of pupils (out of some 2370) as contrasted with a program of intramural athletics or physical education in which all students participate, regardless of their height, weight, ability to coordinate, agility or lack of either, is "an integral part of contemporary education," though very popular with and approved by school authorities, students and the public.

A board of education must not permit, as is evident in this instance this Board did not permit, its judgment as to what is beneficial or what is detrimental to the high school student, whose welfare and education have been entrusted to it by law, to be affected by the unrestrained enthusiasm of the adult population for athletic contests, events and those who excel in such sports, the "cheers" and sometimes the "boos" emanating from the high school stadium and gymnasium or the revenue derived from the turnstiles.

It is well settled that the right to relief sought by a relator in mandamus must be clear, 35 Ohio Jurisprudence (2d), 254. The burden of establishing such a clear right is on the relator, 35 Ohio Jurisprudence (2d), p. 254.

We find that the relator has failed to sustain this burden of showing that he has a clear right to the relief he seeks and that the writ of mandamus should be denied.

The conclusion we have here reached must be considered as sustaining the validity of this rule as and when it applies to those extra-curricular activities and only those, in which, the evidence reveals, relator seeks to be permitted to participate, the primary one, of course, being the playing of basketball.

We have purposely refrained from directly expressing an opinion on or coming to any conclusion respecting the rule's validity when applied to any of the other of such activities hereinbefore set out as being embraced within it. In our opinion, neither the pleadings nor the evidence requires nor even permits such an expression or finding.