**Albert DAVIS, a minor, etc., Plaintiff,**

**v.**

**Clifford T. MEEK, as President of the Board of Education, etc., et al., Defendants.**

**Civ. No. C 72–100.**

United States District Court, N. D. Ohio, W. D.

May 5, 1972.

Harland Britz, Toledo, Ohio, for plaintiff.

Calvin W. Bristley, Jr., City Sol., Fremont, Ohio, for defendants.

## MEMORANDUM

DON J. YOUNG, District Judge.

This matter was heard upon the motion of the plaintiff for a preliminary injunction, and the evidence. The complaint seeks an order restraining the defendant Board of Education members and school officials from excluding the plaintiff from extracurricular activities in the Fremont Ross High School, and also seeks damages.

At the hearing, the evidence showed that the plaintiff became eighteen years of age on January 15, 1972. On January 22, 1972, he married a young lady sixteen years of age who was at the time pregnant by him. Sometime after the marriage she suffered a miscarriage.

The plaintiff is a senior in the Fremont Ross High School. He is scholastically an honor student, and is also an excellent baseball player, having been a member of the varsity baseball team in the two immediately preceding years. Four major league scouts have talked to him, and at least four colleges have written to him expressing interest in granting him an athletic scholarship.

In March, 1970, the Board of Education of the Fremont City Schools, by a unanimous vote, adopted Section 5138 in its Policy Handbook dealing with marriage and pregnancy of school students. Among other provisions, this regulation required that a boy who "contributed to the pregnancy of any girl out of wedlock" should be restricted to classes for

the balance of the school year. Normal extracurricular activities might be resumed the following school year. Any student who married, regardless of the circumstances leading to the marriage, should be restricted to classes leading to graduation.

On May 20, 1971, a new policy handbook was adopted, apparently superseding the former one. Section 6.18 of the new handbook, which was in force at all pertinent times herein, reads as follows:

Section 6.18 *Marriage*

A. Married pupils are permitted to attend school.

B. Married pupils are not permitted to participate in school sponsored extracurricular activities including the Junior-Senior Prom.

The plaintiff was aware of this rule before he got married. After his marriage, he was told that the rule would be enforced against him, and his name was not placed on the eligible list for baseball when the list was prepared and filed.

The defendants justify the rule by showing that students that marry usually dropped out of school, but that after the adoption of the rule, fewer students dropped out, and a larger number of those who did continued their education by a program of home instruction which was provided. Since it is desirable to keep children in school until they have graduated from high school, a policy designed to discourage marriage among students is claimed to be a proper exercise of the power of the school board.

The plaintiff's contention is that he has a constitutional right to get married, and the rule which deprives him of an important part of the school's program because of his marriage is an action taken under color of state law which interferes with his civil liberties.

This problem has been presented a few times in the past in the state courts, which have uniformly held, but often with vigorous dissents, that a rule of a board of education denying married students the right to participate in extracurricular activities is valid.

The leading case in this regard is Kissick v. Garland Ind. Sch. Dist., 330 S.W. 2d 708 (Tex.Civ.App. 1959). Other similar cases are Cochrane v. Board of Education of Mesick Consol. Sch. Dist., 360 Mich. 390, 103 N.W.2d 569 (1960); State ex rel. Baker v. Stevenson, 94 Ohio Law Abst. 545, 27 Ohio Op.2d 223, 189 N.E.2d 181 (1962), and Board of Dir. of Ind. Sch. Dist. of Waterloo v. Green, 259 Iowa 1260, 147 N.W.2d 854 (1967). In the *Cochrane* case, Judge Edwards, now of the Court of Appeals of the Sixth Circuit, was one of the majority of the members of the court which did not agree with the reasoning of the lower court, but in spite of that the decision below was affirmed by a divided court upon technical grounds, although a minority of the judges felt the decision affirmed was correct upon the merits.

The United States Courts do not seem to have addressed themselves directly to the problems involved in this action, but the questions are squarely presented here, and must be met head-on. It is not easy to do this, because on the basis of this Court's experience over almost twenty years, the plaintiff has acted wrongly, and the rules adopted by the defendants are based upon a very reasonable desire to deal with a social problem of great complexity and difficulty. This Court has previously expressed his strong approval of their objective of discouraging teenage marriages. 13 Juv. Court Judges J. 25 (April, 1962) and 11 Juv. Court Judges J. 22 (December, 1960). However, the issues cannot properly be disposed of by saying that the plaintiff does not come into equity with clean hands, or by invoking the maxim *ex turpi causa non oritur actio*, because the strict legal basis for either of those courses is not here present.

Plaintiff's basic contention is that he has a right to get married. This is perhaps based upon a misreading of the decision of the Supreme Court in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). This case stands for the proposition that the right of marital privacy is within the penum-

bra of the specific guarantees of the Bill of Rights, and that therefore neither the state or federal governments may invade that privacy.

However, the right to get married is traditionally a strictly local matter, which each state may regulate as it sees fit. Both the General Assembly of Ohio, by the enactment of marriage statutes and the Supreme Court of Ohio, by its interpretation thereof, have addressed themselves to this problem.

In keeping with the increasing complexity of our modern civilization and the absolute necessity of a certain amount of maturity and knowledge on the part of each member thereof, the General Assembly has declared that male persons under 18 and female persons under 16 do not have the maturity and knowledge requisite to the entering of the marriage relationship with a full awareness of the ensuing obligations and responsibilities to their spouses, to the society in which they would establish themselves and to the children which they would rear. The General Assembly has declared further that, although male persons between the ages of 18 and 21 and female persons between the ages of 16 and 21 *might* have such a degree of maturity and knowledge as to be capable of creating a stable marriage relationship in which to rear children, final judgment on such matters must be made by a mature person or an institution having such right. State v. Gans, 5 Ohio Op.2d 472, 476, 168 Ohio St. 174, 179, 151 N.E.2d 709, 712 (1958).

The Ohio Supreme Court goes on to say:

In conclusion, it is quite apparent that Section 2151.01, Revised Code, embodies some of the reasons why the public policy of this state is against 'child marriages,' . . . . Thus, although the minor participants in 'child marriages' are 'more to be pitied than scorned,' the same attitude does not hold true of adults who participate in effecting such marriages—and it is

the opinion of this court that it will behoove all adults, including parents, to discourage such marriages. *Gans* at 478, at 183, at 715.

This language of the Supreme Court of Ohio evidences a clear understanding of the notorious fact that the failure rate of teenage marriages is appallingly high. The defendants, too, were aware of the fact shown in evidence by plaintiff's expert witness, Dr. David Glick, that married high school students have an "unique and high drop-out rate", with almost sixty-seven percent of the girls dropping out. In the current school year, about seventy percent of the married students in the Fremont schools have dropped out.

Nevertheless, the fact remains that the plaintiff did legally get married, without in doing so violating any law of the state. He had thus attained a status where his marital privacy might not be invaded by the state, even for the laudable purpose of discouraging other children from doing what he did.

It further appears that if the purpose of the defendants' rule was to discourage student marriages, the statistics which they offered did not tend to show that it was achieving its purpose, for there has been a slow increase in the percentage of married students, but the rate has been greater since the adoption of the rule than it was before. In the 1968–69 school year 1.23% of the students in the system were married. In the 1969–70 school year, 1.44% were married. In 1970–71, the percentage was 1.61%, a steady increase of about .2% each year. In the current school year, 1971–72, the percentage is 1.97% and may go higher, since the year is not over, a .36% increase over the previous year. Conversely, of course, the defendants point out that prior to the adoption of their rule, the drop-out rate of married students was almost 100%, and at most, less than a third of the students who dropped out continued their education by home instruction, while in the current year, the drop-out rate is down

to 70%, and more than half of the drop-outs are continuing their education.

Actually, all of these arguments are *post hoc* ones, of little validity at best, and giving no real consideration to the numerous and complex problems involved in teenage marriages. They are attempts to give the answer without any serious attention to the question.

■ It is conceded, however, that extracurricular activities are, in the best modern thinking, an integral and complementary part of the total school program. Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Indeed, this Court has expressly so held. Cordova v. Chonko, 315 F.Supp. 953 (N.D.Ohio 1969). High school pupils are human beings, albeit immature ones, and they learn more in school than just the formal scholastic subjects. Lawton v. Nightingale, Civil No. C 70–343 (N.D.Ohio, January 15, 1971). Thus the rule which plaintiff attacks cuts him off from a part of the education which under the Ohio statutes he has a right to receive, even though he is beyond the age at which he is required to receive it.

It should also be noted that part of the function of educating children is to provide them with the basic knowledge and training necessary to becoming productive adult citizens. However much one may share Thomas Jefferson's scorn for games that are played with a ball, professional baseball is nowadays so important a commercial activity that questions are even raised as to whether or not in some of its manifestations it may come within the scope of the anti-trust laws. Hence it is difficult to refute the argument that a secondary school system that deprives a student of the opportunity to develop his full potential for entering the field of professional baseball is not functioning as it should. When this deprivation is not because the system is impoverished or limited in its educational offerings, but is because it desires to use the deprivation as a disciplinary measure in an attempt to attain objec-

tives, however commendable, of doubtful legal validity, the problem becomes somewhat more sharply in focus.

The state cases upholding the validity of such rules as the one involved here were all decided prior to the case of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Obviously, of course, there is no parallel between the problems of specific First Amendment rights involved in that decision and the matter of the penumbral right to marital privacy involved here. *Tinker* points out that:

> [T]he Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. *Tinker* at 507, 89 S.Ct. at 737.

But *Tinker* also holds that:

> In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are 'persons' under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. *Tinker* at 511, 89 S.Ct. at 739.

*Tinker* also holds that:

> Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained. *Tinker* at 509, 89 S.Ct. at 738.

It is not even contended that the purpose of the rule here involved is to maintain appropriate discipline in the school. The rule does not even attempt directly to forbid the marriage of school pupils. The state legislature has established laws regulating the marriage of children, and the defendants have no

constitutional or statutory authority to change or modify them. Certainly there can be no finding that the marriage of the plaintiff in this case materially and substantially interferes with school discipline, except by the "boot-strap" argument that the rule will be destroyed, and the defendants who promulgated it will thus have their authority weakened.

What the case resolves itself down to, therefore, is the question of whether the defendants may enforce against the plaintiff, who has violated no law, a rule which will in effect punish him by depriving him of a part of his education. Strictly speaking, of course, this would seem to be a matter of state law and policy with which this Court would have no jurisdiction to interfere.

■ However, it seems clear that the effect of the enforcement of the rule which the defendants have promulgated under the color and authority of the state laws, is to put what may be an unendurable strain upon the plaintiff's marriage. This Court feels that it cannot escape the obligation to protect from invasion by the power of the state that right to marital privacy that Griswold v. Connecticut, *supra*, holds to be protected by the Constitution. What greater invasion of marital privacy can there be than one which could totally destroy the marriage itself?

This Court is impelled to find that it is probable that upon final hearing in this case the plaintiff will show himself entitled to protection from the enforcement of the rule in question; that unless plaintiff is granted the relief sought now, he will suffer irreparable injury, for there is only about a month of school time left; and that no comparable harm will be suffered by the defendants if, in the final disposition of this case it should be held that the injunction should not have been granted. A preliminary injunction has been granted requiring the defendants to certify the plaintiff as eligible to participate in any and all extracurricular activities in which he is otherwise qualified to participate.

The defendants should not be faulted for trying, by the adoption of their rule, to discourage child marriages. Unfortunately, the laudable purpose of their rule fails to take into account the extremely limited deterrent value of punishment in areas where action is mainly governed by emotion. What the rule does, as distinguished from what it is intended to do, is to punish the one who has not been deterred at all even by the immediate prospect of the punishment, much less by the example it is supposed to offer. The combined effect of the *Griswold* and *Tinker* cases is to preclude the defendants from even trying to do what they have done. With real sorrow, this Court must so hold.

This memorandum will serve as the Court's findings of fact and conclusions of law. A preliminary injunction has been allowed as prayed for, conditioned upon the plaintiff giving bond in the sum of Two Hundred Fifty Dollars ($250.00), and filed under date of May 2, 1972.