**Malvern BOSTER, Cleda Boster, and Darrin Boster; Harold Brubaker and Clifford Brubaker; Paul Caffrey, Mary Ann Caffrey, and Paul Eric Caffrey; Charlotte Conner and Leonard Potter; Darin Elliott; Ronnie M. Grattan, Annette Grattan, and Chris Hamill; Curtis Laughlin, Mary Ellen Laughlin, and Wayne McGrane; Jay B. McCaskill, Jr., Marilyn McCaskill, and Scott McCaskill; Richard Mayo, Marjorie Mayo, and Shari Mayo; Steve Moore; Merl Pearson, Sherry Pearson, and Shawn Pearson; Richard Roberts, Marlene Roberts, and Tim Roberts; Robert S. Younkin, Rose Younkin, and David Gorges and Stephen Gorges, Plaintiffs,**

**v.**

**Michael PHILPOT, Principal of Haven High School, Haven, Kansas; George Dick, Chairman of the Board of Education, U.S.D. # 312; Harold Voth, Superintendent of Schools, U.S.D. # 312; Albert J. Miller, Vice-Chairman of the Board of Education, U.S.D. # 312; and Wanda Allen, David Hoskinson, Harold Tonn, David Warnken, and Don Weber, Members of the Board of Education, U.S.D. # 312, Defendants.**

**No. 85–1524–K.**

United States District Court,
D. Kansas.

Oct. 14, 1986.

Daniel Brooks, Wichita, Kan., for plaintiffs.

Mary Kathleen Babcock, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This case is before the court on defendants' motion to dismiss or for summary judgment. The plaintiffs are students and parents of students who brought this action pursuant to 42 U.S.C. § 1983, alleging their due process rights were violated when certain disciplinary actions were taken by the superintendent, principal and board of education (defendants).

Two separate incidents are involved in this lawsuit. The first incident involved several Haven, Kansas high school students and two former Haven high school students who participated in vandalizing school property. These young people, after admitting their guilt to the high school principal, were suspended for three days; the two nonstudents were told they could not attend any Haven High School extracurricular events. Each of these students and their parents, as well as the nonstudents, now claim their due process rights were violated by the suspension.

The second incident involved two students who, while attending a basketball game, were reprimanded by the Haven High athletic director for unsportsmanlike behavior. Apparently these students ignored the reprimand. The next day they were informed by the principal that they were not to attend the next night's game. However, the students—accompanied by their parents—did attend that game, but were precluded from attending a later game. They claim their due process rights were violated as they were not afforded a hearing.

Additionally, the plaintiff parents claim the defendants' alleged violations of the Kansas Open Meeting Act, K.S.A. 75–4317 et seq., deprived them of their liberty interest in participating in public board of education meetings.

The defendants claim there are no material facts in dispute and that they are entitled to judgment as a matter of law. Defendants argue that both the students and nonstudents involved in the vandalism, and their parents, have failed to state a claim under 42 U.S.C. § 1983. Alternatively, they argue the students were afforded all process due them. Likewise, defendants argue the students who were prohibited from attending a basketball game have either failed to state a claim or were afforded all process due them. As to the alleged violation of the Kansas Open Meeting Act, defendants argue this court has no subject matter jurisdiction over such claim. Finally, defendants contend the individually named defendants are entitled to qualified good faith immunity.

For the reasons set forth herein, the court finds the students who were suspended were afforded all process due them. The court finds that the parents of these students lack standing to assert their due process rights were violated in connection with the school's discipline of their children. The court further finds the students and nonstudents who were precluded from attending a basketball game have failed to state a claim. Finally, the court finds that no liberty interest is implicated by a violation of the Open Meeting Act, so this court has no jurisdiction over such claim.

Summary judgment is appropriate only when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c). A motion under Rule 56 will be denied unless the movant demonstrates beyond a reasonable doubt that he is entitled to a favorable ruling. *Madison v. Deseret Livestock Co.*, 574 F.2d 1027 (10th Cir. 1978). However, once "the moving party

has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. In the language of the rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. —, —, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538, 552 (1986). *See also Celotex Corp. v. Catrett*, 477 U.S. —, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In this case, no material facts, those necessary for the speedy resolution of this case, are in dispute.

## FACTS

The court finds the following to be the material, uncontroverted facts:

1. In October, 1984, the principal of a grade school in U.S.D. # 312 advised the superintendent of U.S.D. # 312, defendant Voth, of incidents of vandalism at the grade school. In one incident, the grade school was broken into, furniture was damaged, money was missing, papers were strewn about, and someone had defecated on the floor. None of the plaintiffs herein have been alleged to have been involved in this incident. But, in other incidents occurring on two succesive weekends in October, 1984, the grade school athletic field was vandalized: bleachers were tipped over, a flagpole was broken down, as were a set of goalposts, and there were tire ruts in the field.

2. These incidents were reported to the school board. The board decided to ask the police department to assist in the investigation.

3. After the October 22, 1984 board of education meeting, Mr. Voth was informed that a witness to the athletic field vandalism had identified plaintiffs Wayne McGrane and Leonard Potter.

4. Both McGrane and Potter denied involvement when questioned by the principal, defendant Philpot.

5. In Principal Philpot's presence, plaintiffs Wayne McGrane, Chris Hamill, and Scott McCaskill were interviewed by police. None admitted any involvement in the vandalism.

6. After this interview, Scott McCaskill confessed his involvement to his father, plaintiff Jay B. McCaskill. Several of Scott's friends also admitted their involvement to Mr. McCaskill.

7. The next day (November 8, 1984) Mr. McCaskill talked with Mr. Voth, informing him of the confessions. Mr. McCaskill strongly expressed his view that these individuals should not be suspended. Mr. Voth stated that no criminal charges would be pressed, and may or may not have indicated that no suspensions would be imposed. He did *not* promise that *no* disciplinary action would be taken.

8. Mr. Voth asked Mr. McCaskill to discuss the matter with Mr. Philpot. Mr. Voth then phoned Philpot and told him the contents of his discussion with McCaskill. McCaskill later expressed his view to Philpot that the students should not be suspended.

9. Later the same day, Mr. McCaskill and six students met with Mr. Philpot in his office. The students admitted their involvement in the vandalism. Those students present were Darrin Boster, Scott McCaskill, Paul Caffrey, Leonard Potter, David and Steve Gorges. Plaintiffs Wayne McGrane and Chris Hamill were not present for the meeting, but each had authorized other students to include them as participants in the vandalism. The two non-students, Moore and Elliott, were also identified. Mr. Philpot asked the boys present to sign their names as an admittance. They complied with the request. He assured them no criminal charges would be filed.

10. On November 12, 1984, the school board met with Jay B. McCaskill in executive session. It is the policy of the board to meet in executive session in order to discuss any matter in which an identified student may be mentioned in a context that

would be injurious to the student's reputation. Mr. McCaskill told the board about the confessions to the vandalism. He told the board he did not think suspensions should be imposed, and that Mr. Voth had promised no suspensions. Both Philpot and Voth informed the board that they had *only* promised no criminal sanctions, and had not promised to not impose suspensions.

11. On November 19, 1984, the school board met in open meeting and again discussed the vandalism. The board determined that board policy regarding discipline for the destruction of property should be followed, and it so informed Mr. Philpot.

12. The board's policy, as expressed in the Haven High School Student Handbook for 1984–85, under "Guidelines on Suspension or Expulsion," provides:

7. Willful destruction of student, staff or school property. Payment for replacement of property and suspension or expulsion. Reports to legal authority if warranted.

13. Mr. Philpot then determined that short-term suspensions of three days should be imposed. On November 20, 1984, Mr. Philpot spoke to those students—in groups of two or three—who had admitted participation in the vandalism. At that time, he informed them of the suspensions.

14. Notices to the parents were mailed that same day. The parents came to the school the next day and demanded a hearing, which was refused.

15. With regard to the two nonstudent participants (plaintiffs Steve Moore and Darin Elliott), the board determined they should be banned from all Haven High School activities for the remainder of the 1984–85 school year.

16. The board attempted to notify Moore and Elliott of its decision by certified mail. Moore and Elliott either did not accept the certified letters or did not receive them, for the unopened letters were eventually returned to the school.

17. Moore and Elliott attended a Haven High game played in Andover in February of 1985. Mr. Philpot presented them with letters banning them from Haven High activities and asked them to leave. Police officers were present, but did not enforce the ban. Therefore, Moore and Elliott stayed at the game.

18. Moore and Elliott were prevented from attending only one home game thereafter and no away games.

19. Mr. Philpot and the school board president, George Dick, were interviewed by a Hutchinson News reporter about the vandalisms. In January, 1985, the following article appeared in the Hutchinson News:

The vandalism at Mount Hope Grade School involved overturned bleachers, goalposts and a flagpole that were torn down, a classroom that was ransacked and defecation on the floor, Philpot said Wednesday morning.

Eight students were suspended from school for three days after they admitted their involvement.

However, Mrs. Laughlin, whose son was one of the eight, said the students were told they would not be suspended if they confessed.

 * * * * * *

Two others, a graduate of Haven High School and one who had dropped out, were implicated by the others and received letters from the Board of Education telling them they were not to be seen on school property or at school activities the rest of the year, Dick [Philpot] said.

20. During a substate tournament basketball game in late February of 1984, plaintiffs Shawn Pearson and Clifford Brubaker were repeatedly reprimanded by the athletic director for unsportsmanlike conduct (antagonizing supporters of the opposing team).

21. The next day Philpot called the students into his office and, with the athletic director present, recounted their behavior. They responded belligerently. Mr. Philpot then forbade the students to attend the next substate game. However, they did

attend, accompanied by their parents. Philpot then barred them from attending the first state tournament game, and informed their parents of this by letter. The students refrained from attending that game.

## DISCUSSION

Chief Justice Burger, in one of his last opinions, made the following observations about the public school system which this court finds pertinent to the case at bar:

> The role and purpose of the American public school system was well described by two historians, saying "public education must prepare pupils for citizenship in the Republic.... It must inculcate the habits and manners of civility as values in themselves conducive to happiness and as indispensable to the practice of self-government in the community and the nation." C. Beard and M. Beard, New Basic History of the United States 228 (1968). In *Ambach v. Norwick*, 441 U.S. 68, 76–77 [99 S.Ct. 1589, 1594, 60 L.Ed.2d 49] (1979), we echoed the essence of this statement of the objectives of public education as the "inculcat[ion of] fundamental values necessary to the maintenance of a democratic political system."

> \* \* \* \* \* \*

> The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class; schools must teach by example the shared values of the civilized social order.

> The Court also spoke to the school's role and its rights regarding the discipline necessary to achieve these goals:

> ... the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings.

> \* \* \* \* \* \*

> We have recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have re-

spected the value of preserving the informality of the student-teacher relationship."

*Bethel School District v. Fraser*, 478 U.S. —, — — —, 106 S.Ct. 3159, 1360, 1362–63, 92 L.Ed.2d 549, 557–58, 560 (1986) (Court held that school did not violate student's First Amendment rights by imposing a short-term suspension as discipline for a lewd speech he gave at a school assembly).

The due process clause applies when government has deprived an individual of an interest in liberty or property. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Harris v. Blake*, 798 F.2d 419 (10th Cir.1986). In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the United States Supreme Court recognized a property interest in public education. However, "the constitutional rights of students in public schools are not automatically co-extensive with the rights of adults in other settings." *Bethel*, 478 U.S. at —, 106 S.Ct. at 1371, 92 L.Ed.2d at 558. The Supreme Court has recognized that "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures." *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). The Court has also recognized that federal court review of disciplinary decisions is to be limited. In *Woods v. Strickland*, 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975), the Court stated:

> It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive and procedural rights while at school. But § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this nation relies necessarily on the discretion and judgment of school administrators and school board members and § 1983 was not intended to be a vehicle for federal

correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.

(Citations omitted.)

In this case, the court must determine: (1) whether the students who were suspended for their admitted vandalism were denied due process; (2) whether the students who were precluded from attending basketball games had a property interest in attending the games; (3) whether the parents of any of these students were denied due process; (4) whether any alleged violation by the school board of the Kansas Open Meeting Act infringed a liberty interest belonging to the parents.

## I.

After admitting their involvement in the grade school vandalism, plaintiffs Steve Gorges, David Gorges, Wayne McGrane, Chris Hamill, Leonard Potter, Darrin Boster, Eric Caffrey, and Scott McCaskill were suspended for three days. This suspension was in accordance with the board's policy set forth in the student handbook. In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 the Supreme Court analyzed the rights of students and responsibilities of parents in the context of short-term suspensions not exceeding 10 days. The Court determined that "students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." 419 U.S. at 579, 95 S.Ct. at 738. The Court characterized the hearing which is required before a short-term suspension may be imposed as "informal", constituting a discussion of the alleged misconduct between disciplinarian and student. The Court further stated that the "hearing" could be held immediately after notice of the suspension. No rights to counsel, to confront and cross-examine witnesses, or to call witnesses were mandated. 419 U.S. at 582–83, 95 S.Ct. at 740. The Court's holding requires merely that in connection with the short-term suspension, "the student be given oral or written notice of the charges, *and, if he denies them,* an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581, 95 S.Ct. at 739.

The Court's position was recently reaffirmed in *Bethel School District v. Fraser,* —— U.S. ——, ——, 106 S.Ct. 3159, 3166, 92 L.Ed.2d 549, 560, wherein the Court stated, "Two days' suspension from school does not rise to the level of a penal sanction calling for the full panoply of procedural due process applicable to a criminal prosecution."

K.S.A. 72–8902, the Kansas statute governing suspensions, fully complies with *Goss* and provides in part:

(b) ... no suspension for a short term [not exceeding 5 days] shall be imposed upon a pupil or student without giving the pupil or student notice of the charges and affording the pupil or student a hearing thereon. The notice may be oral or written, and the hearing may be held immediately thereafter. The hearing may be conducted informally but shall include the following procedural due process requirements: (1) the right of the student or pupil to be present at the hearing, and (2) the right of the student or pupil to be informed of the charges; and (3) the right of the student or pupil to be informed of the basis for the accusation, and (4) the right of the student or pupil to make statements in defense or mitigation of the charges or accusations.

■ In this case, the students clearly received all process due them. After admitting their involvement in the grade school vandalism, each of the students was called into the principal's office and was notified of the 3–day suspension period. Whether or not the students were then allowed to ask questions is controverted, but is of no materiality in this case. While K.S.A. 72–8902(b) requires that the student have a chance to make a statement, it is well established that the process due may vary in particular cases depending upon the circumstances. *Keough v. Tate Co. Bd. of Education,* 748 F.2d 1077, 1081 (5th Cir.

1984); *McLain v. Lafayette Co. Bd. of Education*, 673 F.2d 106, 110 (5th Cir. 1982). It has been observed that "the standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter, and the circumstances involved." *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir.1970). The crucial fact in this case is that the plaintiff students admitted their guilt. Therefore, there was no need for them to present their side of the story. This result follows from *Goss*, wherein the Court required that the student receive an explanation of the evidence against him and have an opportunity to present his side of the story only if he first *denied* the charges.

Even if this court were to find that the procedures employed by defendant Philpot technically violated the requirements of K.S.A. 72–8902, the students would still be unable to show that they suffered any prejudice so as to establish a denial of due process. By admitting their guilt, the plaintiffs waived their right to a hearing. *See Black Coalition v. Portland School Dist. No. 1*, 484 F.2d 1040, 1045 (9th Cir.1973); *Fenton v. Stear*, 423 F.Supp. 767, 771 (W.D.Pa.1973).

As was stated in *Keough v. Tate Co. Bd. of Education*, 748 F.2d at 1083:

> To establish a denial of procedural due process, a party must show substantial prejudice.... Whether [the student] admitted the charges is therefore relevant in determining substantial prejudice or harm.... Clearly there was substantial evidence to support the district court's finding that [the student] admitted the charges and therefore his suspension did not result from a procedural due process deprivation. [Citation omitted.] The district court did not err in finding that a procedural due process violation, if any, did not cause injury to [the student].

Because the plaintiff students received all process due them under the circumstances, the disciplinary decision to suspend them is simply not reviewable in federal court. *Wood v. Strickland*, 420 U.S. at 326, 95 S.Ct. at 1003.

These plaintiffs also assert that the article published in the Hutchinson News, which quoted defendant Philpot regarding the vandalisms, was a further violation of their right to due process, in that they have a liberty interest in their reputation. However, this article did not name any of the plaintiffs. Further, even if it had named them, an interest in reputation *alone* does not give rise to a liberty interest. *See Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Since this court has held that the students were not denied due process when suspended, their claim of damage to reputation does not—by itself—rise to the level of a deprivation of a liberty interest. Accordingly, this claim will be dismissed for lack of a federal question.

## II.

Both the two nonstudents who participated in the grade school vandalism (Moore and Elliott) and the students who were reprimanded for unsportsmanlike conduct at a basketball game (Pearson and Brubaker) were ordered not to attend a subsequent basketball game or games. Moore, Elliott, Pearson and Brubaker now claim that their due process rights were violated because they did not receive a hearing prior to imposition of this discipline.

In order for the plaintiffs to show a violation of their due process rights, they must show that *attending* interscholastic athletic games is a constitutionally protected civil right. Although this court has discovered no reported cases where this issue was raised, the cases are abundant which hold that a student has no constitutionally protected property interest in *participating* in extracurricular activities. *See, e.g., Park Hills Music Club, Inc. v. Bd. of Education*, 512 F.Supp. 1040 (Ohio 1981). In *Albach v. Olde*, 531 F.2d 983 (10th Cir.1976), the Tenth Circuit discussed a student's interest in participating in intramural athletics:

Appellant cites numerous cases in support of the contention that high school athletic regulations must survive constitutional scrutiny. The cases are distinguished by the fact that, in the context of athletic regulations, clearly defined constitutional principles are at issue. *See Brenden v. Independent School District 742,* 477 F.2d 1292 (8th Cir.), *Gilpin v. Kansas State High School Activities Ass'n, Inc.,* 377 F.Supp. 1233 (D.Kan.); and *Reed v. Nebraska School Activities Ass'n,* 341 F.Supp. 258 (D.Neb.)—sexual discrimination; *Davis v. Meek,* 344 F.Supp. 298 (N.D. Ohio)—invasion of marital privacy. *See also Howard University v. National Collegiate Athletic Ass'n,* 166 U.S.App.D.C. 260, 510 F.2d 213—alienage discrimination; *Louisiana High School Athletic Ass'n v. St. Augustine High School,* 396 F.2d 224 (5th Cir.)—racial discrimination. That is not the case here. *Participation in interscholastic athletics is not a constitutionally protected civil right.*

\* \* \* \* \* \*

*Goss* recognizes a student's entitlement to a public education as a property interest which is constitutionally protected. A ten-day suspension from school without a hearing was found to violate a student's right to due process under the Fourteenth Amendment. But it is necessary to note that in framing the property interest the Court in *Goss* speaks in terms of the "educational process." 419 U.S. at 576, 95 S.Ct. at 737, 42 L.Ed.2d at 735. The educational process is a broad and comprehensive concept with a variable and indefinite meaning. It is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups, which combine to provide an atmosphere of intellectual and moral advancement. We do not read *Goss* to establish a property interest subject to constitutional protection in each of these separate components.

531 F.2d at 984–85 (emphasis added). This decision was reaffirmed in *Colorado Seminary v. Nat'l Collegiate Athletic Ass'n,* 570 F.2d 320 (10th Cir.1978).

■ If participating in athletics does not give rise to a constitutionally protected student right, clearly attending athletic games as a mere spectator cannot be viewed as a constitutionally protected student right. Plaintiffs' arguments to the contrary are illogical and meritless.

■ Moreover, as to the nonstudents— Moore and Elliott—they have conceded the validity of proscribing their attendance at home games. Because they were not excluded from any away games, they can allege no damage.

Accordingly, the claims of these plaintiffs must be dismissed for failure to state a claim under § 1983.

### III.

Plaintiffs Merl and Sherry Pearson, Robert S. and Rose Younkin, Jay B. and Marilyn McCaskill, Curtis and Mary Ellen Laughlin, Ronnie M. and Annette Grattan, Charlotte Conner, Paul and Mary Ann Caffrey, Harold Brubaker, and Malvern and Cleda Boster, are parents of the students who were suspended or who were barred from attending a basketball game. These plaintiff parents contend the discipline of their children was imposed without sufficient notice to the parents and without affording them the right to inquire or file a grievance, and as such, the defendants interfered with their parental rights in violation of their right to due process of the law. The defendants contend that the parents lack standing to assert this claim, as any deprivations of due process were suffered by others—specifically, their children.

Under Kansas law, parents have a right to receive notice of their child's suspension. K.S.A. 72-8902 provides:

(c) ... A written notice of any short-term suspension and the reason thereof shall be given ... to the parents or guardians [of the student involved] with-

in 24 hours after the suspension has been imposed....

\* \* \* \* \* \*

(g) Whenever any written notice is required under this act to be given to the parents or guardians of any student or pupil, it shall be sufficient if the same is mailed to the residence of the parents or guardians at the address on file in the school records of the student or pupil.

■ It is uncontroverted that the parents herein received written notice of the suspensions within 24 hours. This is all that is required under Kansas law. However, these parents claim they have the right to challenge the discipline imposed, and by not being allowed to do so their parental rights were interfered with, constituting a violation of their due process rights.

■ The right to a free public education is a right which belongs to students, rather than their parents. *Goss v. Lopez*, 419 U.S. 565, 573–74, 95 S.Ct. at 735–36; *see also Stern v. Tarrant Co. Hosp. Dist.*, 755 F.2d 430, 434 (5th Cir.1985). The Supreme Court has repeatedly held that parents have standing to challenge the *conditions* in public schools their children attend. *Bender v. Williamsport Area School Dist.*, 475 U.S. ——, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (Burger, C.J., dissenting); *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). However, each of these cases involved parents who challenged religious activities being conducted in or supported by the school. Clearly, parents have a constitutionally protected right to raise children according to their own religious views. *See Wiley v. Franklin*, 468 F.Supp. 1214 (E.D.Tenn.1979) (parents have standing to challenge law under First Amendment which allowed bible study on school property).

While the Supreme Court has held that parents have standing to challenge conditions in the public schools which may infringe on their religious beliefs, the Court has never gone so far as to hold that parents have standing to assert constitutional due process claims belonging to their children. Recently, the Supreme Court dismissed for lack of substantial federal question a case where the issue raised was whether a state statute requiring parents to send their children to public schools violates parental liberty in relation to their children. *Snider v. Virginia*, (unpub., Va. Sup.Ct., Nov. 21, 1984), *cert. dism'd* —— U.S. ——, 106 S.Ct. 2911, 91 L.Ed.2d 591 (1986). By finding this issue did not present a federal question, the Court reaffirmed its view that the right to a public education belongs to the students rather than their parents.

In *Baker v. Owen*, 423 U.S. 907, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975), the Court summarily affirmed the lower court's holding that parental approval of corporal punishment is not constitutionally required. The Court thus indicated that public schools have the right to determine the nature, extent, and procedures for student discipline without first seeking parental approval.

In *Piscataway Township Bd. of Education v. Caffiero*, 86 N.J. 308, 931 A.2d 799 (1981), the constitutionality of a statute which imposed vicarious liability on parents whose children vandalized school property was challenged. One of the issues raised was whether it violated equal protection. The fundamental right alleged was the right to a public education. The New Jersey Supreme Court noted that the right to a public education is recognized as a fundamental right under the state's constitution, "however, the statute does not burden this fundamental right [because] it imposes liability on parents, *not on children whose rights to a free public education are at stake.*"

■ Likewise, when a student is suspended, it is the *student* who is entitled to due process because it is the student—not his parents—who has a right to a free public education. *Goss v. Lopez*, 419 U.S. at 581, 95 S.Ct. at 739. In this case, the students were afforded all process due

them. Their parents have no standing to now assert that their own due process rights were violated. The public school clearly had the right to impose discipline in compliance with the children's due process rights without first seeking permission or approval from the children's parents. The parents received notice of the suspensions, and they were not entitled to more. Accordingly, the parents' claims under § 1983 must be dismissed.

## IV.

The plaintiff parents, along with a private citizen, Richard Roberts, also contend that alleged violations of the Kansas Open Meeting Act, K.S.A. 75–4317 *et seq.*, infringed on their liberty interests in participating in the political process in violation of their right to due process pursuant to 42 U.S.C. § 1983. The defendants contend the court has no jurisdiction over this claim. The court agrees.

■ The Kansas Open Meeting Act confers no constitutional rights. *See Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1922). The Act provides its own enforcement mechanism. K.S.A. 75–4320a. Accordingly, as no federal question is involved, this court has no jurisdiction to determine whether the Kansas Open Meeting Act was complied with in this case.

## V.

Having determined that defendants are entitled to summary judgment on each of the claims against them, the court need not address the issue of whether defendants Voth and Philpot are entitled to qualified immunity.

■ In finding that defendants are entitled to summary judgment on all claims against them, the court would emphasize the view that this case should never have been brought in the first instance. The students involved herein did wrong and so admitted. The discipline imposed by the school administrators was deserved and should have been supported by the parents rather than opposed by them. If this court were to entertain this lawsuit, it would license parents and students in *all* schools to sue principals and board members whenever they feel they have been treated the least bit unfairly. Disposition of such matters is simply not the role of the federal trial court!