Sarah G. JOHNSON

v.

UNITED STATES of America.

William G. BARTER et ux.

v.

UNITED STATES of America.

Ralph D. BLAIR et ux.

v.

UNITED STATES of America.

Civ. Nos. F 74–111, F 74–112 and F 74–113.

United States District Court,
N. D. Indiana,
Fort Wayne Division.

Nov. 8, 1976.

Jeanne S. Miller, New Haven, Ind., for plaintiffs.

John R. Wilks, U. S. Atty., Fort Wayne, Ind., F. Gerald Burnett, Trial Atty., Tax Div. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OF DECISION AND ORDER

ESCHBACH, Chief Judge.

In these three consolidated cases plaintiffs seek refunds of income taxes paid for the year 1971 on the ground that the rate schedules of the Internal Revenue Code, 26 U.S.C. § 1, unconstitutionally discriminate against them as married persons. The cases are now before the court on plaintiffs' and defendant's cross motions for summary judgment. For reasons which are set forth hereinafter, plaintiffs' motion for summary judgment will be denied. Defendant's motion for summary judgment will be granted in the Barter and Blair cases but denied in the Johnson case.

I

With the exception hereinafter noted in the Johnson case, the material facts which

give rise to these causes of action are not in dispute. Plaintiff in F 74–111, Sarah G. Johnson, filed an individual income tax return for the year 1971, showing a taxable income of $38,486.19, upon which she paid a tax of $12,913.52, computed at the rate applicable to married persons filing separately, IRC § 1(d). During 1971, all of her taxable income was a result of her separate earnings and income. Throughout that entire year she maintained as her home a household which was the principal place of abode of her three unmarried minor children. She bore áll of the cost of maintaining this household and furnished the sole support of her three children by her marriage to their deceased father. In 1971, she remarried, lived with her husband, and remained married to him on December 31, 1971.[1]

On January 23, 1973, Ms. Johnson filed a claim for a refund of $2,816.82, the difference between the taxes she paid based on the "married filing separately" rate schedule and the amount she would have paid had she been entitled to file as an "unmarried head of household."[2] The tax rates for individuals who meet the statutory re-

---

1. This remarriage subsequently ended in divorce on June 26, 1972.

2. 26 U.S.C. § 2(b) provides (emphasis supplied):

> *Definition, of head of household.—*
>
> . (1) *In general.*—For purposes of this subtitle, an individual shall be considered a head of a household if, and only if, *such individual is not married at the close of his taxable year*, is not a surviving spouse (as defined in subsection (a)), and either—
>
> (A) maintains as his home a household which constitutes for such taxable year the principal place of abode, as a member of such household, of—
>
> (i) a son, stepson, daughter, or stepdaughter of the taxpayer, or a descendant of a son or daughter of the taxpayer, but if such son, stepson, daughter, stepdaughter, or descendant is married at the close of the taxpayer's taxable year, only if the taxpayer is entitled to a deduction for the taxable year for such person under section 151, or
>
> (ii) any other person who is a dependent of the taxpayer, if the taxpayer is entitled to a deduction for the taxable year for such person under section 151, or
>
> (B) maintains a household which constitutes for such taxable year the principal place of abode of the father or mother of the taxpayer, if the taxpayer is entitled to a deduction for the taxable year for such father or mother under section 151.
>
> for purposes of this paragraph, an individual shall be considered as maintaining a household only if over half of the cost of maintaining the household during the taxable year is furnished by such individual.
>
> Subsection (c) of § 2 further provides:
>
> (c) *Certain married individuals living apart.*—For purposes of this part, an individual who, under section 143(b), is not to be considered as married shall not be considered as married.

For purposes of determining an individual's marital status, section 143 of the Code provides:

> (a) *General rule.*—For purposes of this part—
>
> (1) The determination of whether an individual is married shall be made as of the close of his taxable year; except that if his spouse dies during his taxable year such determination shall be made as of the time of such death; and
>
> (2) An individual legally separated from his spouse under a decree of divorce or of separate maintenance shall not be considered as married.
>
> (b) *Certain married individuals living apart.*—For purposes of this part, if—
>
> (1) an individual who is married (within the meaning of subsection (a)) and who files a separate return maintains as his home a household which constitutes for more than one-half of the taxable year the principal place of abode of a dependent (A) who (within the meaning of section 152) is a son, stepson, daughter, or stepdaughter of the individual, and (B) with respect to whom such individual is entitled to a deduction for the taxable year under section 151,
>
> (2) such individual furnishes over half of the cost of maintaining such household during the taxable year, and
>
> (3) during the entire taxable year such individual's spouse is not a member of such household,
>
> such individual shall not be considered as married.

The cumulative effect of these provisions was to preclude Ms. Johnson from filing as an unmarried head of household, since on December 31, 1971, she was married to and living with her then husband and had lived with him during 1971.

quirements of "unmarried head of household" are set forth in § 1(b) and are lower than those imposed by § 1(d).

The Internal Revenue Service denied Ms. Johnson's refund claim and she thereafter timely instituted this action pursuant to 28 U.S.C. § 1346.

Plaintiffs in F 74–112 and F 74–113 are married couples who filed joint returns with taxes computed at the rates provided in § 1(a) for married persons filing jointly.

The Barters, plaintiffs in F 74–112, reported a combined taxable income of $20,-488.49, of which $12,771.73 was the separate earnings and income of William Barter and $7,716.76 which was attributable to the earnings and income of his wife, Wanda Barter. The Barters paid $4,536.32 in tax on this income, of which they claimed a refund of $160.50 on December 12, 1972. This sum represented the difference in the amount they paid and that which they would have paid had each been allowed to use the rate schedule for single persons, § 1(c).

Plaintiffs in F 74–113 are Ralph and Pauline Blair. Their 1971 joint return showed a taxable income of $25,147.09, on which a tax of $6,072.95 was paid. Mr. Blair's separate earnings and income were $16,539.32 and those of Mrs. Blair were $7,962.45. A refund claim for $479.58 was filed by the Blairs on February 2, 1973. This sum likewise represented the difference between the tax actually paid and that which would have been due if each had been entitled to utilize the unmarried rate schedule of § 1(c).

The Internal Revenue Service denied the refund claims of both couples, and they subsequently instituted timely actions under 28 U.S.C. § 1346 in this court. All plaintiffs profess sincere beliefs in the teachings on marriage of the religious denominations with which they are affiliated.[3] Plaintiffs are all residents of Indiana, which is a non-community property state, and which by statute and case law has abrogated the common law disabilities of married women.[4]

II

Specifically, plaintiffs attack sections 1 and 143[5] of the Internal Revenue Code, as amended by the Tax Reform Act of 1969, Pub.L.No.91–172, 83 Stat. 487. They assert that the rate schedules of section 1, based as they are upon the marital status of the taxpayer, are unconstitutional as applied to them. Their attack is wide-ranging, encompassing provisions of the First, Fourth, Fifth, Ninth and Tenth Amendments to the United States Constitution. They contend that:

1) The due process clause of the Fifth Amendment forbids tax rate differentiation by which the tax on the income of one spouse is measured in part by the income of the other spouse.

2) The due process clause of the Fifth Amendment forbids gender-based tax rate differentiation that results in a greater burden on married female workers than is imposed upon married male workers.

3) The due process clause of the Fifth Amendment forbids marital classification by which higher tax rates are

---

**3.** Sarah Johnson is a member of the Lutheran Church in America, which teaches that "marriage is ordained by God as a structure of the created order." *Social Statements of the Lutheran Church in America, Sex, Marriage and Family*, (adopted by the Fifth Biennial Convention of the Lutheran Church in America at Minneapolis, Minnesota, June 25–July 2, 1970). The Barters are members of the United Methodist Church, and the Blairs, although not members, have from time to time attended services of that denomination since their marriage and believe in its teachings in regard to

marriage. Those teachings assert the "sanctity of marriage" and recognize that it is "blessed by God." *Social Principles of the United Methodist Church* (adopted by the 1972 General Conference of the Church at Atlanta, Georgia).

**4.** *See, e. g.,* Married Womens Act, [1923] Indiana Acts, Ch. 63, p. 190, *codified in* Ind.Code § 31–1–9–1 *et seq.; Troue v. Marker,* 253 Ind. 284, 252 N.E.2d 800 (1969) (establishing wife's right to sue for loss of husband's consortium).

**5.** For the text of § 143, *see supra* note 2.

imposed on the taxable income of a married person (whose spouse has significant income) than are imposed on the same taxable income of an unmarried person.

4) The due process clause of the Fifth Amendment forbids classification by which higher tax rates are imposed on the taxable income of a married person who lives with her spouse than are imposed on the taxable income of one who does not.

5) The free exercise clause of the First Amendment prohibits the imposition of higher tax rates on those who practice their religious beliefs in regard to marriage.

6) The "fundamental right to marry," protected by the First, Fourth, Fifth, Ninth and Tenth Amendments is violated by a tax rate differentiation which imposes higher tax rates on the taxable income of a married person (whose spouse has significant income) than on the same taxable income of an unmarried person.[6]

■ Defendant counters that the tax rate schedules attacked by plaintiffs do not suffer from any constitutional infirmities and that there exist reasonable bases for the differentials in the rate structures. Defendant also raises the question of the plaintiffs' right to any recovery in these actions. It is this latter question to which the court turns first, mindful of the admonition in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), that if non-constitutional grounds exist for a decision dispositive of the litigation, the court should not decide the constitutional issues, even though properly presented.

### III

■ The Government contends that because they failed to file separate income tax returns for the 1971 tax year by April 15, 1972, the Barters and the Blairs are not entitled to any recovery of taxes in this suit. The Government's argument is that both couples, by way of this suit, seek in effect to revoke their joint returns and utilize the lower rates applicable to single persons. This, the Government asserts, is precluded by Treas.Reg. § 1.6013–1(a)(1) (1973), which requires that if spouses have previously elected to file a joint return and thereafter wish to file separate returns, they must file their separate returns by the last date on which a joint return could be filed.[7] In these instances that date would have been April 15, 1972.[8]

Assuming the validity of the regulation in question, the court finds that it does not operate as a bar to the Barters' and Blairs' claims. It is obvious that the regulation was not designed or intended to apply in a situation such as this where the taxpayers attack the constitutionality of the rates which by statute are applicable to them.

Moreover, acceptance of the Government's argument would produce the anomalous result that in order to test the constitutionality of the married rate schedules, the Barters and the Blairs would have been required to pay *even more* in taxes than

---

**6.** Plaintiffs also originally alleged that the enforcement of the rate schedules violated their Fifth Amendment right to protection against self-incrimination. In their motion for summary judgment, however, plaintiffs appear to have abandoned this claim.

**7.** 26 C.F.R. § 1.6013–1 provides:

(a) *In general.* (1) * * * For any taxable year with respect to which a joint return has been filed, separate returns shall not be made by the spouses after the time for filing the return of either has expired. See, however, paragraph (d)(5) of this section for the right of an executor to file a late separate return for a deceased spouse and thereby disaffirm a timely joint return made by the surviving spouse.

**8.** 26 U.S.C. § 6072 provides:

(a) *General Rule.*—In the case of returns under section 6012, 6013, 6017, or 6031 (relating to income tax under subtitle A), returns made on the basis of the calendar year shall be filed on or before the 15th day of April following the close of the calendar year and returns made on the basis of a fiscal year shall be filed on or before the 15th day of the fourth month following the close of the fiscal year, except as otherwise provided in the following subsections of this section.

would single persons with equal incomes, since it is apparent that had they filed separate returns as married persons the rates of § 1(d) would have produced a greater tax on their incomes than did the § 1(a) rates which they utilized.

Finally, and perhaps most significantly, if the Government's argument were accepted, the practical effect would be to insulate from attack the rate schedule of § 1(a). If all taxpayers, who wished to challenge the rate differentials between single and married persons were required to file a separate return, presumably none would have the requisite "standing" to challenge the "married filing jointly" rates. This court cannot countenance such a result.

Accordingly, the court finds that the Barters' and Blairs' failure to file separate returns does not operate as a bar to their right to recovery.

On the other hand, the Government argues that since Ms. Johnson and her husband had the option of filing a joint return, which at § 1(a) rates would produce a lower tax than those in § 1(b) on equivalent levels of income, she should not be heard to complain. The question, therefore, is whether Ms. Johnson's claim is properly presented.

█ It is unclear from the record why Ms. Johnson could not file a joint return with her then-husband, Robert Taylor.[9] Nor does the record indicate whether Taylor had any income. Despite possible dis-

covery problems,[10] the court will refrain from deciding Ms. Johnson's claim absent proof that she as a practical matter could not have filed a joint return.[11]

█ By paying taxes at the rate for separate marrieds under § 1(d), the plaintiff may have voluntarily disadvantaged herself solely for the purpose of making this constitutional challenge. In order for Ms. Johnson properly to challenge the statute, she must have a "good-faith pocketbook action." *Doremus v. Board of Ed. of Borough of Hawthorne*, 342 U.S. 429, 434–35, 72 S.Ct. 394, 96 L.Ed. 475 (1952). If the financial injury she alleges has been self-inflicted, serious questions exist as to whether she has proper standing to raise her constitutional objections or, more generally, whether this is a feigned case. *Cf. United States v. Johnson*, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943); *Lord v. Veazie*, 8 How. 251, 12 L.Ed. 1067 (1850). Had she filed a joint return, she would have incurred no injury *vis-a-vis* the head of household rates she now seeks to use and would therefore have no standing to raise her constitutional claims.[12] Both Ms. Johnson's and the Government's motion for summary judgment will therefore be denied. A material issue of fact remains as to whether Ms. Johnson voluntarily incurred a pocketbook injury which might under certain circumstances infer a lack of good faith. It is impossible to make a proper determination

9. On page 2 of the affidavit of Ms. Johnson, submitted as part of the appendix to plaintiffs' brief in support of their motion for summary judgment, she refers to her response to Interrogatory No. 2 submitted to her by the Government. In her response, filed on March 15, 1975, she answered the Government's question about her failure to file a joint return by stating that she did not know why her husband did not file a joint return and that she had no way of forcing him to do so. She did not state that he refused to file such a return with her.

10. Since Johnson and her husband filed separate returns, the Government has taken the position that Johnson is not entitled to see her husband's tax return, and has denied her discovery requests aimed at disclosure of that document. It would appear that the Government's position is well founded, since § 7213(a)

makes it unlawful for any officer or employee of the United States to disclose the income tax return of anyone, unless authorized by law. Inasmuch as Johnson and her husband each filed separate returns, neither is authorized to examine the other's return. *See* § 6103, and the regulations promulgated thereunder, 26 C.F.R. 301.6103.

11. While the court could conjecture that her husband refused to file a joint return, on the record it would be unjustified in doing so. It will await the disclosure of further facts and circumstances surrounding the filing of her return.

12. Of course, had Ms. Johnson filed a joint return, she could have raised the same claims as the Barters and Blairs.

of these questions on the present record before the court.

## IV

In order to place in proper focus the Barter and Blair challenges to the current tax rates, it is necessary to review briefly the history of the income tax structure. Until 1948 the rate structure of the Internal Revenue Code did not differentiate between taxpayers on the basis of their marital status. The individual was the taxable entity. Under this arrangement, those married persons who lived in some community property states enjoyed a tax saving over married persons in non-community property jurisdictions, because under the laws of certain community property states, earnings and income were treated as belonging equally to both marital partners regardless of who earned them. Given the progressive rate structure, the inclusion of one half the income in each spouse's return had the effect of substantially reducing the couple's total tax liability relative to couples in non-community property states. The savings were greatest in "one-earner" families, i. e., those where only one spouse earned all or most of the family's income.

This method of "income splitting" was upheld by the Supreme Court of the United States in *Poe v. Seaborn*, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930). In *Poe*, the Court held that a wife was taxable on one-half of the community income, which was comprised in that case of the earnings and investment income of the husband. The Court reasoned that the income could be thus split, since under the community property laws of Washington, where the plaintiff husband and wife resided, she had a vested interest in her share of the community income. The Court's decision in *Poe* involved only a construction of the income tax statutes and did not reach the question of the power of Congress to tax income to the spouse who earned it, regardless of the characterization of the other spouse's interest in that income under state law.

■ Following the decision in *Poe*, the legislatures of a number of non-community property states, anxious to reduce the taxes of their residents, enacted community property laws and others indicated their willingness to follow suit. In 1948, Congress responded to this state legislative activity by enacting the first income splitting provisions of the Code.[13] It is clear from the legislative history that the purpose of Congress was to create geographical equality in taxation.[14]

The means chosen was to allow married couples to file joint returns.[15] Although there continued to be only one tax rate schedule, the tax on a married couple's aggregate income was calculated as if each had earned one-half of it. Thus, the applicable tax rate was applied to only one-half of the couple's income and the resulting figure was multiplied by two.[16] Since the tax rates remained progressive, the effect of this income splitting provision was to lower the marginal tax rate applicable to total income. As had been the case in community property states, this change produced the greatest reduction in taxes for those couples in which there was only one income earner. The advantages of the income splitting provisions diminished as the income of one spouse approached that of the other.

In 1951, Congress for the first time created a second rate schedule.[17] This schedule was for use by unmarried taxpayers who maintained a household for certain purposes. The rates applicable to such individuals were set at points approximately halfway between those applicable to single persons and those applied to married persons filing joint returns.

13. Revenue Act of 1948, §§ 301–05, 62 Stat. 110.

14. *See* H.Rep.No.1274, 80th Cong., 2d Sess., p. 24 (1948); S.Rep.No.1013, 80th Cong., 2d Sess., p. 25.

15. *Id.* § 303.

16. *Id.* § 301.

17. Revenue Act of 1951, § 301, 65 Stat. 452.

966

This income splitting system continued in effect until 1969. During those years, the system came under increasing criticism from single persons whose tax on comparable incomes exceeded by as much as 40.9%[18] those of married couples filing joint returns. Criticism of the disproportionate tax burden of single persons relative to married individuals filing jointly prompted Congress in 1969 to adopt new rate schedules with the express purpose of reducing this disparity. In place of the two-rate schedules theretofore in effect, the Tax Reform Act of 1969 established four rate schedules for individuals.[19] Section 1(a) sets forth the rate schedule for married persons who file joint returns and generally provides the lowest marginal rates. Section 1(b) rates apply to the incomes of those persons who file returns as unmarried heads of household and at most levels of income are somewhat higher than those applicable to married persons filing jointly. The third rate schedule, § 1(c), imposes still higher rates than those imposed by § 1(b) on the income of unmarried non-heads of household and certain married individuals who qualify under § 143. The highest rates are found in § 1(d), which is applied to the incomes of estates, trusts, and married persons who file separate returns.[20]

The structure of the new rate schedules achieved Congress' major aim of reducing the tax burdens on single persons. Thus, at no equivalent level of income does the tax paid by a single person exceed that of a married couple filing jointly by more than 20%.

The reduction in the rates applicable to single persons, besides reducing their tax burden, had another effect, which forms the bases of the Barter and Blair claims. In certain instances where both spouses have "significant" income ("significant" is generally 20% or more of the couple's total income), married persons pay *more* in tax than would two single persons with the same aggregate income.[21] The Barters and the Blairs contend that they have paid more than they would had they been single and that the additional amounts paid constitute an unconstitutional exaction from them of a "marriage penalty."

V

In asserting that the tax rate schedules, as applied to them, are violative of the due process clause of the Fifth Amendment, plaintiffs place major reliance on *Hoeper v. Tax Commission*, 284 U.S. 206, 52 S.Ct. 120, 76 L.Ed. 248 (1931). That case involved a challenge, under the due process and equal protection clauses of the Fourteenth Amendment, to the tax system of the State of Wisconsin. Under § 71.05 of the Wisconsin tax statute, each married couple living

18. Summary of H.R. 13270, Tax Reform Act of 1969, as Reported by the Committee on Finance, 91 Cong., 1st Sess., pp. 99, 101–02.

19. § 803(a), Pub.L.No. 91–172, 83 Stat. 678. The rate schedules are codified at 26 U.S.C. § 1(a)–(d), and became effective for tax years beginning after December 31, 1970.

20. The differences in the tax rates imposed by the four schedules are not uniform. Generally, the greatest differences exist at the middle income levels, and the disparity becomes less at either end of the income spectrum. The following chart is partially illustrative of the rate differentials:

Marginal Rate in %

| TAXABLE INCOME | § 1(a) married couple joint return | § 1(b) head of house-hold | § 1(c) single person | § 1(d) married individual separate income |
|---|---|---|---|---|
| 2,000 | 16 | 18 | 19 | 19 |
| 4,000 | 19 | 19 | 21 | 22 |
| 8,000 | 22 | 23 | 25 | 28 |
| 12,000 | 25 | 27 | 29 | 36 |
| 16,000 | 28 | 31 | 34 | 42 |
| 20,000 | 32 | 35 | 38 | 48 |
| 24,000 | 36 | 38 | 40 | 50 |
| 28,000 | 39 | 42 | 43 | 53 |
| 32,000 | 42 | 45 | 50 | 55 |

Pechman, *Federal Tax Policy*, App. p. 49 (1971).

21. "One-earner" families generally still enjoy tax advantages relative to single persons with equal income, since the former group has always benefited most from the income splitting provisions of the prior law, which under the 1969 Act was replaced by a separate rate structure in § 1(a).

together was required to combine their incomes and apply to the aggregate total the progressive tax rates which the statute imposed. The total tax so computed was enforceable against the husband or the wife and exceeded that which would have been due had each spouse been allowed to file a separate return and apply the tax rate to his or her own taxable income. Another section of the statute, § 71.09(4)(c), allowed the filing of separate returns, but in the event separate returns were filed, the tax was computed on the same combined total.[22]

Mr. and Mrs. Hoeper both had income and earnings but did not file a joint return. They elected instead to file separate returns and compute the tax on each marital partner's income individually. An assessment for the difference between the tax paid by the Hoepers individually and that which was computed on their combined income was made against Mr. Hoeper. After protest, Hoeper paid the tax and unsuccessfully sought a refund through the state courts of Wisconsin. On appeal to the Supreme Court of the United States from the Wisconsin Supreme Court's denial of his claim for refund, Hoeper claimed that the Wisconsin tax system effectively attributed to him income of another on which he was then taxed and that such an exaction was arbitrary and discriminatory.

After a careful review of Wisconsin's laws on the status of a married woman's right to property, which provided that a husband had no right to any of his wife's separate earnings and income, the Supreme Court held that since exaction under the Wisconsin statute measured one person's income by reference to that of another it violated principles of due process.

Plaintiffs here contend that *Hoeper* is dispositive of their claims. They argue that the federal tax structure as applied to them suffers from the same constitutional infirmities which characterized the Wisconsin tax system, namely, that it measures for tax purposes the income of one spouse by reference to that of the other. Although they concede that the two systems are not identical, they assert that the federal statute indirectly produces the same result as that achieved directly by the Wisconsin provisions. They argue that §§ 1(a) and 1(d) in effect compel the combining of income of two spouses who live together, since the sum of the taxes computed under § 1(d) is always equal to or greater than the total tax computed under § 1(a). And, they point out, the tax imposed by § 1(a) on the joint income of two spouses who each have "significant" income is greater than would have been imposed had the spouses been free to select the rates of § 1(b) or § 1(c).

■ Without pausing to consider whether *Hoeper* would be followed today even on its own particular facts,[23] this court is satisfied that the tax statutes under attack here are distinguishable from those of Wisconsin. Concededly, the Wisconsin revenue law allowed a husband and a wife to file joint or separate income tax returns as does federal law. See 26 U.S.C. § 6013.[24] The crucial difference is that under Wisconsin's statute, regardless of which type of return was selected, the tax was assessed on the couple's aggregate income. The federal law, on the other hand, contains no

22. The Court noted that while an election under § 71.09(4)(c) to file separate returns would have reduced the amount of tax as compared to that imposed upon joint returns, the total tax would still have exceeded the sum of the husband's and wife's taxes if separately assessed on their individual incomes. 284 U.S. at 213, n.1, 52 S.Ct. 120.

23. The decision in *Hoeper* was over the vigorous dissent of Holmes, Brandeis and Stone, JJ., whose views of the due process clause as a restriction on the power of state legislatures, popularly denominated "substantive due proc-

ess," differed from those in the majority of the Court at the time that *Hoeper* was decided. Their view was subsequently to prevail. *See Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

Later, Justice Douglas, joined by Justice Black, questioned the underlying rationale of *Hoeper. Fernandez v. Wiener*, 326 U.S. 340, 365, 66 S.Ct. 178, 90 L.Ed. 116 (1945) (Douglas, Black, JJ., concurring).

24. Subsection (d)(3) of § 6013 imposes joint and several liability for the tax computed on a married couple filing jointly.

such compulsory income aggregation provision. If married persons each elect to file separate returns, each may do so, and the tax computed is based *solely upon each taxpayer's own separate income.* It is true that in most instances it is more advantageous for the couple to file a joint return because the rates of § 1(d) applicable to separate return income are generally higher, and at least always equal, to those provided in § 1(a). However, the fact remains that each married taxpayer may make the individual choice to file a separate return and thus avoid "attribution" of his income, if that it be, to the income of his spouse. Any aggregation of the two spouses' income in a joint return is entirely a voluntary matter. Therefore, as distinguished from Wisconsin, the federal government has not attempted to make income that which is not in fact the taxpayer's income merely by calling it such.[25]

## VI

Plaintiffs' second ground of attack on the tax rate schedules is that the due process clause forbids gender-based tax rate differentiation that results in a greater burden on married working females than is imposed upon married male workers. The thrust of plaintiffs' argument in this regard is that generally a "working wife" is the second earner in the family, and, thus, if the couple files a joint return, her husband's marginal tax rate becomes her minimum tax rate. Accordingly, the income of a "working wife," subject as it is to the higher marginal tax rates of § 1(a) when combined with that of her husband, is effectively less than that generated by the same efforts by a male. Such a result, plaintiffs claim, is forbidden by the Constitution, citing *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).

Plaintiffs concede that the income tax laws are gender neutral on their face but

contend that in application they work to discriminate on the basis of sex. Such sex-based discrimination, they assert, runs afoul of the Fifth Amendment's guarantee of equal protection of the laws.

█ It is true that the due process clause of the Fifth Amendment is infused with equal protection guarantees. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Accordingly, enactments of Congress have been subjected to similar equal protection analysis as that applied to state statutes by virtue of the Fourteenth Amendment. Among the Federal statutes found to contravene the due process clause are those which classify on the basis of sex. *See, e. g., Weinberger v. Wiesenfeld, supra; Frontiero v. Richardson, supra.*

This court, however, does not perceive the application of the statutes here in question to be that type of invidious gender-based discrimination which the Court found constitutionally intolerable in cases such as *Frontiero* and *Wiesenfeld.* In fact, Congress in enacting these statutes avoided the very type of assumptions about the economic status of men and women which the Court found impermissible in those cases.

█ Plaintiffs' argument proceeds on the assumption that the husband is the family's "primary" wage earner and any income which the wife's efforts produce is "secondary." The "married filing jointly" rate schedule, of course, is not based on any such assumption and if selected by the taxpayers treats the income of both spouses as an aggregate sum, and no reference is made as to whose income was "principal" and whose "secondary." Indeed, the Court in *Frontiero* expressly held that Congress could not assume that a wife's income was supplemental to that of her husband and legislate on that basis. Yet, here, plaintiffs assert

---

**25.** We have no doubt that, because of the fundamental conceptions which underlie our system, any attempt by a state to measure the tax on one person's property or income by reference to the property or income of another is contrary to due process of law as guaranteed by the Fourteenth Amendment. That which is not in fact the taxpayer's income cannot be made such by calling it income.

284 U.S. at 215, 52 S.Ct. at 122 (citation omitted).

that Congress' very failure to recognize that a wife's income is the "second" income of a family and if included with her husband's on a joint return is taxed at a higher rate amounts in some way to gender-based discrimination. This argument is unacceptable.

Moreover, in those cases in which the Supreme Court has found statutes to contravene the due process clause because of gender-based classification, the discriminatory aspects of the statute burdened all affected members of one sex. Thus, in *Frontiero* all service women had to establish their husband's dependency before they could qualify for the additional benefits made available to all men without any such proof. In *Wiesenfeld*, the Social Security Act was found to discriminate against *all* women who left surviving husbands with dependent children. In *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), *all* women suffered in a like manner from Idaho's statutory presumptions that males were more qualified to administer decedent's estates. In contrast to those cases, the federal tax schedules at issue here cannot be said to burden all women, if indeed any are so burdened.

Plaintiffs' position that working women who file joint returns with their husbands are taxed at a greater rate than men is based on a sort of chronological priority in the incomes of all married persons. Their argument presumes that the husband is the first to enter the labor market, later to be followed by his wife. It is in those instances in which the wife's salary is added to her husband's that the alleged discriminatory effect takes place.

However, plaintiffs ignore those situations where the wife is the first to enter the work force or where the spouses are both employed when married. In neither of those events can the wife's income be considered the "second" in time to that of her husband and thus be taxed at a higher rate. Indeed, in the former instance it is the male who might allege with equal persuasion that his work efforts produce less economic benefit for his family than those of a mar-

ried woman whose income, to accept plaintiffs' characterization, was "first" in time. In sum, the court finds no basis for holding that the statutes here under attack invidiously discriminate on the basis of sex.

## VII

Another prong of plaintiffs' due process argument is that the tax rate structure impermissibly infringes upon certain fundamental rights. They contend that by imposing a greater total tax on the combined income of a married couple, each of whom has "significant" income, than would be imposed on their separate incomes were they single, the statute penalizes them for exercising their fundamental right of marriage and interferes with their fundamental rights of privacy and association. Thus, they term the additional tax a "marriage penalty."

The Government counters that the statutes here in issue do not intrude upon any fundamental personal rights of plaintiffs by impeding their right to marry or denying their rights to privacy or free association. The Government also questions whether the right to marry is itself a fundamental right. *See Davis v. Meek*, 344 F.Supp. 298, 299–301 (N.D.Ohio 1972); *contra, Holt v. Shelton*, 341 F.Supp. 821 (M.D.Tenn.1972); *O'Neill v. Dent*, 364 F.Supp. 565 (E.D.N.Y.1973).

## A

Plaintiffs' assertion that marriage is a "fundamental right," as that term is used for due process or equal protection analysis, finds considerable support in the opinions of the Supreme Court. As early as 1923, the Court in *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), recognized the central position that marriage holds in our society. In *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the Court again commented upon the importance of marriage in striking down an Oklahoma statute which provided for sterilization of certain "habitual criminals." Writing for the Court, Mr. Justice Douglas noted

We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race. 316 U.S. at 541, 62 S.Ct. at 1113.

This theme continued in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), wherein the Court struck down Connecticut's criminal restrictions on the access of married persons to contraceptives. The Court found that a "penumbra" emanating from rights expressly recognized in the Bill of Rights created a "zone of privacy" embracing the marital bedroom. In 1967, Chief Justice Warren, writing for a unanimous Court, struck down Virginia's anti-miscegenation statute as violating the due process and equal protection clauses of the Fourteenth Amendment, holding that

> The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.
>
> Marriage is one of the "basic civil rights of man," fundamental to our very existence and survival. *Loving v. Virginia*, 388 U.S. 1, at 12, 87 S.Ct. 1817, at 1824, 18 L.Ed.2d 1010.

Later, in *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), in the context of a constitutional challenge to a Connecticut statute requiring the payment of a filing fee in order to bring an action for divorce, Mr. Justice Harlan wrote:

> As this Court on more than one occasion has recognized, marriage involves interests of basic importance in our society. See, *e. g., Loving v. Virginia*, 388 U.S. 1 [87 S.Ct. 1817, 18 L.Ed.2d 1010] (1967); *Skinner v. Oklahoma*, 316 U.S. 535 [62

S.Ct. 1110, 86 L.Ed. 1655] (1942); *Meyer v. Nebraska*, 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042] (1923). 401 U.S. at 376, 91 S.Ct. at 785.

More recently in *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), the Court by Mr. Justice Blackmun commented on its decision in *Boddie*:

> The denial of access to the judicial forum in *Boddie* touched directly, as has been noted, on the marital relationship and on the associational interests that surround the establishment and dissolution of that relationship. On many occasions we have recognized the fundamental importance of these interests under our Constitution. 409 U.S. at 444, 93 S.Ct. at 637 (citations omitted). *See also Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1971).

Although the language in these cases clearly supports the proposition that marriage is fundamental in nature, two distinctions are noteworthy. First, no case brought to the attention of this court has flatly stated that marriage is a fundamental right in the context of a constitutional challenge to the Internal Revenue Code. Second, the statutes involved in the Supreme Court cases cited above effectively *prohibited* individuals either from making a decision as to marital status, from selecting the marital mate of his or her choice, or from making a highly personal decision under the umbrella of marital privacy. Plaintiffs here do not specifically allege that the Code provisions they attack have *prohibited* them from making these choices. Taken together, these distinctions suggest that while marriage may be a fundamental right, a close examination of the circumstances should precede any legal conclusions drawn from the existence of that right.[26]

---

26. Plaintiffs allege that the penalties exacted from them infringe upon their "fundamental right *to* marry" (emphasis added). It might appear that there is a standing question present since plaintiffs are already married. They do not allege that the extra taxes they have paid have in effect abrogated their right to marry by bringing them to the brink of divorce. Thus, it might be argued that the plaintiffs lack standing to assert the right. However, the right is not limited to the act of becoming married, but encompasses the entire marriage relationship. *See Davis v. Meek*, 344 F.Supp. 298 (N.D.Ohio 1972); *Holt v. Shelton*, 341 F.Supp. 821 (M.D. Tenn.1972). Whether denominated the "right to marry," the "right of marriage," or the "right to stay married," plaintiffs have standing to attack a provision which may affect that relationship adversely.

In particular, this court must take notice of the fact that the federal government traditionally has had very broad classification powers in the taxation field. In testing both state and federal taxing statutes, the Supreme Court generally has accorded classifications a presumption that the categorization is reasonable and constitutional and has upheld a tax classification if any state of facts rationally justifying it is demonstrated to or perceived by a court. *United States v. Md. Savings-Share Ins. Corp.,* 400 U.S. 4, 91 S.Ct. 16, 27 L.Ed.2d 4 (1970). In addition, the Supreme Court consistently has acknowledged its lack of expertise in the complex arena of taxation. *See, e. g., San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). On the other hand, the Court has traditionally employed the strict scrutiny standard when a fundamental right is at stake. If a statute is found to burden a fundamental right, the Court has required that the statute be justified by a showing that it is necessary to promote a compelling governmental interest, *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and that there be no "reasonable [way] to achieve these goals with a lesser burden on constitutionally protected activity." *Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972). The burden of demonstrating that no less burdensome means exist has traditionally been placed on the government.

This court recognizes the fundamental nature of marriage and the freedom to marry under the Constitution and is cognizant of the requirement that a governmental regulation or statute which burdens or impinges upon the exercise of those rights must be subjected to strict judicial scrutiny. However, this court is also mindful of the deference to be accorded the legislative branch in the exercise of its taxing power and the fact that "[n]o scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 41, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). The doctrine of judicial deference cannot be completely disregarded even in the face of a right as fundamental as that of marriage. Accordingly, the level of scrutiny to which this court will subject the statutory provisions in question must take into account not only the importance attached to the right of marriage but also the inherently complex nature of legislative decisions in the field of taxation.

### B

Given the fundamental nature of the right alleged to be infringed or burdened, the court must inquire whether in fact the classification scheme infringes upon or burdens the exercise of the constitutionally protected rights of these plaintiffs.

At the outset, it should be emphasized that the tax rate schedules do not in all instances disadvantage those who are married. In those cases where only one spouse has income or where the income of only one marital partner is "significant," to borrow plaintiffs' phrase, the tax structure continues to favor those who marry. It is only when each spouse has "significant" income that the alleged "marriage penalty" results.

Nevertheless, it appears that there are substantial numbers of married couples whose distribution of income within the marital unit subjects them to greater taxes than would be the case if they were single.[27] Plaintiffs fit into this category. The Bar-

---

**27.** Charts presented to the House Ways and Means Committee for the year 1969 showed that in 28.8% of those "two-earner" couples, the income of the second spouse accounted for 21% or more of the couple's aggregate income. It is at this level and above that the "marriage penalty" occurs. *See* Hearings before the Ways and Means Committee of the House on Tax Treatment of Single Persons and Married Persons Where Both Spouses are Working, 92nd Cong., 2d Sess., p. 81 (1972). [Hereinafter referred to as Hearings.]

ters have paid $160.50 more on their 1971 income by filing a joint return than if each could have filed a separate return using the rate schedule for single persons under § 1(c). Similarly, the Blairs paid $479.58 more on their 1971 taxable income than they would have by filing separate returns using the § 1(c) rates.

While there is no question that the Barters and Blairs have paid more than they would have paid were they not married, this is not dispositive of the issue of whether these amounts are a constitutionally significant burden on their right of marriage in the context of this attack on the Internal Revenue Code.[28] In cases involving other fundamental rights, but not involving attacks on the Internal Revenue Code, the Supreme Court has interpreted broadly the concept of a burden. In particular, in holding durational residency requirements for voting and for welfare unconstitutional as an abridgment of the fundamental right to travel, the Court dismissed contentions that the requirements must actually seek to or actually deter such travel before they may be deemed unconstitutional. Instead, the Court found it sufficient that the requirements *penalized* the exercise of the right. *Dunn v. Blumstein,* 405 U.S. 330, 339–41, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Such reasoning is not directly applicable here. Whatever legal label may be attached to taxes, in practical effect all taxes are a form of penalty. While the additional taxes paid by the plaintiffs here may constitute a penalty, the mere lack of mathematical precision in the application of a taxing scheme to all citizens, married and single, does not render it constitutionally infirm. When the Founding Fathers gave the federal government the power to tax, they were certainly aware that the imposition of taxes would affect multifarious activities and that even when structured in the most nondiscriminatory manner possible, taxes would still lack mathematical precision in their application to some citizens in certain circumstances. Hence, to conclude that the

taxes in dispute here "penalize" some married persons is to do no more than to recognize the true nature of the animal. Not all married persons are adversely affected and there is certainly no evidence that Congress intended to burden or deter marriages of two-income couples. A further inquiry into the nature and extent of the burden on these taxpayers is necessary in order to determine whether, in the context of the legislative branch's power to tax, a constitutionally significant burden on these taxpayers' right to marriage exists.

The Government argues that the tax schedules do not burden or infringe upon the right of marriage of these taxpayers but merely recognize that two married persons living together have a greater ability to pay taxes than do two single individuals, each of whom maintains his or her own household. By sharing living accommodations, it is argued, two married persons achieve certain economies in household expenses, *e. g.,* rent, utilities, etc., over two single persons each of whom maintain separate residences.

Of course, the problem with this justification for the differentiation in the tax treatment afforded these married persons is that it does suffer from imprecision. The Government's own statistics demonstrate the inexactitude of the classification scheme. In testimony before the House Ways and Means Committee, Edwin S. Cohen, Assistant Secretary of the Treasury for Tax Policy, indicated that approximately 50% of those persons filing single returns did not maintain their own households but rather lived with either parents or children. Of the remaining 50% of persons filing single returns—that is, those not living with parents or children—he estimated that about three-quarters, or 37.5% of the total, actually maintained their own households.[29] Thus, approximately 62.5% of persons filing single returns did not maintain separate households and thus apparently had the same ability to pay taxes as two married persons. Yet, the tax rate schedules impose

---

**28.** *Cf.* note 26, *supra.*

**29.** *Hearings, supra,* note 27, at 76–77.

on certain married persons a greater tax burden on the sole basis that they are married. In particular, the Barters and the Blairs have paid more taxes than single persons with the same ability to pay.

The court is aware that practical barriers may exist which would prevent the IRS from taking into account economies of scale enjoyed by unmarried persons. Also, the actual effect on plaintiffs' marriages of the additional taxes they paid is not clear. Nevertheless, the court may assume that the additional taxes paid do constitute a constitutionally significant burden since the court concludes that the Government has a compelling interest which justified such a burden.

## C

■■■ Even if the application of a statutory scheme burdens the exercise of a constitutional right, that does not lead inexorably to a conclusion that the scheme is unconstitutional. Even constitutionally protected rights must give way to laws which are necessary to promote a compelling governmental interest. However, the Government normally bears a heavy burden not only of demonstrating that a compelling interest is served but also that there exists no other reasonable means of serving that interest which imposes a lesser burden on the constitutionally protected activity. *Dunn v. Blumstein, supra,* 405 U.S. at 342–43, 92 S.Ct. 995.

In this regard, it is apparent that the purpose of § 803 of the 1969 Tax Reform Act was to alleviate the tax burden which single taxpayers bore under the previous tax laws. The legislative history demonstrates that Congress was concerned about the imbalance in tax burdens which existed between married and single taxpayers and was determined to afford single taxpayers relief.

It cannot be gainsaid that equalization of taxes among persons with equal ability to pay is a legitimate legislative goal. More particularly, in the context of the past history of the tax treatment of single individuals, Congress acted well within the bounds of its authority in reducing their taxes. At the same time, Congress reaffirmed the longstanding policy that married couples with equal aggregate incomes should pay equal taxes regardless of differences in the contributions of each spouse to the aggregate. The marriage unit has been recognized as a legitimate taxable entity since the original enactment of the joint return provisions in 1948. Equal treatment of such entities is certainly a legitimate legislative objective. As at least one scholar has noted, however, the inevitable result of simultaneously reducing the differential between single and married taxpayers, maintaining the progressive rate structures, and adhering to the policy of equal taxes for all equal income married couples was the imposition of a "marriage penalty" on some two-job married couples.[30] Not all married couples were adversely affected. Indeed, some single taxpayers remain subject to a "singles penalty." Such taxpayers would find their taxes reduced, not increased, if they were to marry. Given the inevitability of this result and the legitimate legislative goals of reducing the differential between single and married taxpayers and of maintaining equal taxes for equal income married couples, it is obvious that the Government has a compelling interest to justify this legislation.

Moreover, it is unclear that "less drastic means" existed which would have achieved these same legislative goals. Plaintiffs, in their brief submitted with the pending motions for summary judgment, offer several suggestions of allegedly less drastic means to achieve the purposes involved here.[31] In fact, however, some of these proposals abrogate the principle of equal taxation of equal income married couples and create other substantial difficulties as well. For exam-

**30.** *See* Bittker, Federal Income Taxation and the Family, 27 Stan.L.Rev. 1391, 1395–96, 1429–30 (1975).

**31.** Brief for the Plaintiffs (1) In Opposition to Defendant's First and Third Defenses and (2) In Support of Plaintiffs' Motion for Summary Judgment at 65–66.

ple, plaintiffs suggest that married taxpayers be allowed to file separate returns using the single rates when they might find it advantageous to do so. Given a progressive rate of taxation, such a system would impose higher taxes on a "one-earner" married couple than on a married couple with the same aggregate income but where both spouses work. The Government also contends that the prohibition against married persons filing separate returns using single rates is necessary to prevent married persons filing separate returns from "arranging their affairs" so as to avoid or lower their taxes. Presumably by this the Government means that without the prohibition, a married person would attempt to shift income or deductions to his or her spouse and thus lower the couple's total tax.

■ Aside from any particular proposal, this court finds itself ill-equipped to judge the merits of plaintiffs' suggestions or of the many others which might be offered. The plaintiffs' proposals are presented in only the barest outline. Lurking beneath these proposals are complexities of the highest order. The proposals may in fact infringe upon other fundamental rights. The process of evaluating specific tax proposals and of weighing their relative discriminatory impacts is primarily a legislative, not a judicial, function.

■ Absent the complexities of the Internal Revenue Code, the Government would normally bear the burden of demonstrating that no less burdensome means exist which would satisfy its interests. Theoretically, a better answer than the present tax structure may exist—one which either does not burden the plaintiffs or which burdens them to a lesser extent. But the tax system is an "arena in which no perfect alternatives exist." *San Antonio Independent School District v. Rodriquez*, 411 U.S. 1, 41, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). Given this fact, this court cannot

require the Government to demonstrate more convincingly than it has that no less burdensome means exist. To do so would be effectively to abrogate the constitutional taxing power of Congress. *Cf. Brushaber v. Union P. R. Co.*, 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493 (1976). Consequently, plaintiffs' argument that the tax rate structure impermissibly infringes on their fundamental right to marry must fail.[32]

■ Plaintiffs also raise other due process objections to the tax rate differentials imposed on them as married persons. They argue that there is no rational reason to justify the higher tax rates applicable to a married person whose spouse has significant separate income. Alternatively, they argue that there is no fair and substantial relation between the higher tax rates imposed on them and the legitimate objectives of the Tax Reform Act of 1969. They cite *Moritz v. Comm'r of Internal Revenue*, 469 F.2d 466 (10th Cir. 1972), *cert. denied*, 412 U.S. 906, 93 S.Ct. 2291, 36 L.Ed.2d 971 (1973), for the proposition that the "fair and substantial relation" standard should be applied. It is unnecessary to treat these arguments extensively since the judicial standards urged here are less strict than the one applied under plaintiffs' fundamental right argument. Since plaintiffs' fundamental right argument has failed, these more general due process arguments must fall with them. Aside from the assertion of a fundamental right, the classifications challenged here do not differ significantly from the challenges single taxpayers raised against the rate structure existing prior to the Tax Reform Act of 1969. Courts unanimously upheld that tax rate disadvantage to single taxpayers on the ground that classification by marital status was reasonable. *Kellems v. Comm'r of Internal Revenue*, 58 T.C. 556 (1972) *aff'd per curiam*, 474 F.2d 1399 (2d Cir. 1973), *cert. denied*, 414 U.S. 831, 94 S.Ct. 63, 38 L.Ed.2d 66 (1973); *Faraco v. Comm'r of Internal Revenue*, 261 F.2d 387

---

**32.** Plaintiffs have also alleged that the statute interferes with their fundamental rights of privacy and association. Without pausing to address the nature of these rights or whether the statute infringes them, the court merely notes that these allegations, if true, must fail for substantially the same reasons that the fundamental right of marriage claim fails.

(4th Cir. 1958); *Shinder v. Comm'r of Internal Revenue,* 395 F.2d 222 (9th Cir. 1968).

## VIII

Finally, the plaintiffs contend that the statutes as applied to them impermissibly infringe on their rights to freely exercise their religious beliefs as to marriage. The court finds no impermissible restriction on those rights by the statutes under attack here.

Plaintiffs contend that they hold sincere religious beliefs concerning marriage and that they are required to pay more taxes solely because they are married. They argue that they are forced to choose between maintaining their marriages and paying higher taxes on the one hand and terminating their marriages and paying lower taxes on the other hand.

 The court does not question the sincerity of plaintiffs beliefs nor their right to practice those beliefs. The provisions of the Internal Revenue Code under attack, however, were not enacted with a design to interfere with plaintiffs' free exercise of their religion. Rather, they were enacted to advance valid, secular government purposes. The free exercise clause of the First Amendment bars "governmental regulation of religious *beliefs* as such." *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). Plaintiffs do not contend that these statutes constitute a direct tax on all marriages. The fact that some married persons may pay more taxes due to their peculiar economic circumstances does not render a general taxing statute a regulation of religious beliefs. The Constitution does not prevent Congress from levying an income tax on all people, regardless of religion, for support of the general government merely because the income tax may have an incidental effect on the religious practices of certain persons. *Cf. Johnson v. Robison,* 415 U.S. 361, 385, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Autenrieth v. Cullen,* 418 F.2d 586 (9th Cir.), *cert. denied,* 397 U.S. 1036, 90 S.Ct. 1353, 25

L.Ed.2d 647 (1969); *United States v. Keig,* 334 F.2d 823 (7th Cir. 1964).

Even if the court agreed that the Code provisions under attack burden plaintiffs' free exercise of their religion, the Government has a sufficiently substantial interest in raising revenue and in equalizing the tax burden between single and married taxpayers to justify any incidental burden on the plaintiffs. *Cf. Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). The same reasoning that required rejection of plaintiffs' "fundamental right" claim also defeats their free exercise clause claim here. Consequently, the plaintiffs' free exercise clause claim must fail.

## ORDER

Accordingly, the defendant's motion for summary judgment is granted in *William G. Barter, et ux. v. United States of America,* Civil No. F 74–112, and *Ralph D. Blair, et ux. v. United States of America,* Civil No. F 74–113, but is denied in *Sarah G. Johnson v. United States of America,* Civil No. F 74–111. The plaintiffs' motion for summary judgment is denied in all three cases.

The clerk shall enter final judgment on a separate document in causes F 74–112 and F 74–113 in favor of the defendant and against the plaintiffs, and the judgments so entered in these two cases shall constitute a final judgment in each pursuant to Rule 54(b), Fed.R.Civ.P., this court having determined that there is no just reason for delay.